STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-93

ALLEN B. MINIX, ET AL.

VERSUS

CITY OF RAYNE, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2014-11006
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Marc T. Amy, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

**REVERSED AND RENDERED.**

**Amy, J., dissents and assigns reasons.**

Jerry J. Falgoust
Falgoust, Caviness & Bienvenu, LLP
Post Office Box 1450
Opelousas, LA   70571-1450
(337) 942-5812
COUNSEL FOR DEFENDANT/APPELLEE:
    City of Rayne

Chuck D. Granger
Christopher D. Granger
Granger Law Firm
Post Office Drawer 1849
Opelousas, LA   70571-1849
(337) 948-5000
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Allen B. Minix
    Kendra Minix
    Cora Minix

**PICKETT, Judge.**

The plaintiffs, Allen B. Minix and Kendra Minix, filed suit on behalf of their minor child Cora Minix after she fell on a sidewalk in front of her high school and sustained multiple injuries. The plaintiffs alleged that the concrete on the sidewalk was cracked and that it shifted underneath the child as she walked, causing her to lose her balance. The trial court found in favor of the defendant, City of Rayne, concluding that the plaintiffs failed to prove that the sidewalk was unreasonably dangerous. The plaintiffs appeal.

## FACTS

According to the record, on the morning of November 19, 2013, Cora Minix, who was fifteen years old at the time, was walking to Rayne High School when she fell on a sidewalk that ran along the street in front of the school. She stated that while she had occasionally walked to school before this incident, this was the first time she walked on this sidewalk. At trial, she explained, "[A]s I stepped on the concrete, I felt like the concrete shifted and I lost my balance and I fell." She added that her "ankle rolled" and that she landed on her right knee, then on her hands. She then noticed "cracks in the sidewalk" where she fell but maintained that she had not seen them prior to the fall. She also related that there were "pieces of grass in various places in the cracks" and that there was a water meter and a light pole to her left where she fell. She alleged that it was a dry, sunny day and that she had not been carrying anything in her hands, had not been distracted, and that she had been looking "straight ahead" as she walked. She also indicated that she had been aware of height deviations on the other sidewalk she had previously used when she walked to school, which also ran adjacent to the school but on the opposite side of the street from the instant sidewalk.

Cora alleged that following the incident, she immediately felt pain in her right hip, right leg, right knee, and right foot, and that she was unable to walk due to the pain in her knee. She testified that she was taken into the school in a wheelchair, but that she only stayed "a couple of minutes" due to "excruciating pain." She explained that her father then took her to the hospital. She was subsequently diagnosed with a right knee contusion and a strained right ankle, and prescribed crutches and medication. Cora further alleged that she continued to feel pain after her fall, and that for two months, she walked with crutches, was homeschooled, and was unable to perform household chores. She further alleged that she still has occasional pain when standing, walking, climbing stairs, and lifting objects. Her pediatrician testified that he believed the fall was the "only explanation" for Cora's symptoms, as she had never complained of pain in these areas prior to her fall.

Cora's parents, Allen B. Minix and Kendra Minix, filed suit on her behalf against the Acadia Parish School Board, which was dismissed by summary judgment, and the City of Rayne. The plaintiffs alleged damages including medical expenses, mental pain and suffering, physical pain and suffering, and loss of enjoyment of life. The City denied liability, asserting that the condition of the sidewalk was open and obvious and therefore did not present an unreasonable risk of harm.

After a bench trial, the trial court dismissed the plaintiffs' claims. Performing a risk-utility analysis, it found that the defect in the sidewalk was open and obvious, that it did not present an unreasonable risk of harm, and that the City of Rayne lacked actual or constructive notice of the defective sidewalk at the time of the fall. The plaintiffs appeal.

## ASSIGNMENTS OF ERROR

On appeal, the plaintiffs assert three assignments of error:

1.      The trial court erred in finding that the City of Rayne did not have actual or constructive knowledge of the defective sidewalk at the time of the subject accident.

2.      The trial court erred in finding that the defective sidewalk was "open and obvious" at the time of the subject accident.

3.      The trial court erred in dismissing all of Plaintiff-Appellant's claims and awarding her no damages for the injuries she sustained as a result of her fall on the defective sidewalk.

## DISCUSSION

*Applicable Law and Standard of Review*

The legislature has limited the liability of public bodies for damages caused by things in their custody or control by enacting La.R.S. 9:2800, which states in relevant part:

> A.  A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
>
> . . . .
>
> C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
>
> D. Constructive notice shall mean the existence of facts which infer actual knowledge.
>
> . . . .
>
> G. (1) "Public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards,

commissions, instrumentalities, officers, officials, and employees of such political subdivisions. Public entity also includes housing authorities, as defined in R.S. 40:384(15), and their commissioners and other officers and employees and sewerage and water boards and their employees, servants, agents, or subcontractors.

(2) "Public site or area" means any publicly owned or common thing, or any privately owned property over which the public's access is not prohibited, limited, or restricted in some manner including those areas of unrestricted access such as streets, sidewalks, parks, or public squares.

In *Chambers v. Village of Moreauville*, 11-898, p. 5 (La. 1/24/12), 85 So.3d 593, 597, the supreme court explained the plaintiff's burden of proof in this case:

Under La. R.S. 9:2800, in order to prove a public entity is liable for damages caused by a thing, the plaintiff must establish: (1) custody or ownership of the defective thing by the public entity; (2) the defect created an unreasonable risk of harm; (3) the public entity had actual or constructive notice of the defect; (4) the public entity failed to take corrective action within a reasonable time; and (5) causation. *Lasyone v. Kansas City Southern R.R.,* 00–2628 (La.4/3/01), 786 So.2d 682, 690; *Dupree v. City of New Orleans,* 1999–3651 (La. 8/31/00), 765 So.2d 1002, 1008.

In order to determine whether a defect presents an unreasonable risk of harm, "the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair." *Pryor v. Iberia Parish Sch. Bd.*, 10-1683, p. 4 (La. 3/15/11), 60 So.3d 594, 596. In performing this risk-utility analysis, the trier of fact must consider: (1) the utility of the thing; (2) the likelihood and magnitude of harm, including whether the defect was obvious and apparent; (3) the cost of preventing harm; and (4) the social utility of the plaintiff's activities, or whether they are dangerous in nature. *Id*. at 597.

"Under Louisiana law, a defendant generally does not have a duty to protect against that which is obvious and apparent." *Bufkin v. Felipe's Louisiana, LLC*, 14-288, p. 7 (La. 10/15/14), 171 So.3d 851, 856. The supreme court has stated

4

that, for a condition to be considered obvious and apparent, it "should be one that is open and obvious to everyone who may potentially encounter it." *Id*. Accordingly, this inquiry "focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge." *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238, p. 18 (La. 4/5/13), 113 So.3d 175, 188.

The supreme court has held that, "although municipalities have a duty to maintain its sidewalks in a reasonably safe condition, they are not insurers of the safety of pedestrians and are not required to maintain sidewalks in perfect condition." *Chambers*, 85 So.3d at 598. Furthermore, "when traveling down a sidewalk a pedestrian is not required to exercise the care required in traversing a jungle, but he must exercise ordinary care, keeping in mind that irregularities exist in sidewalks." *Id*.

Ultimately, a determination as to whether a condition creates an unreasonable risk of harm is subject to the manifest error standard of review. *Pryor*, 60 So.3d 594.

In determining whether a municipality has actual or constructive notice, we have held that a town has constructive notice "if the defect existed for such a period of time that by exercise of ordinary care and diligence, the municipal authority must have known of its existence, and the municipal authority had a reasonable opportunity to guard the public from injury by remedy of the defect." *Ambrose v. City of New Iberia*, 08-1197, p. 2 (La. App. 3 Cir. 4/1/09), 11 So.3d 34, 37 (citing *Dawson v. City of Bogalusa,* 95–0824 (La.App. 1 Cir. 12/15/95), 669 So.2d 451.)

*Actual or Constructive Notice*

In their first assignment of error, the plaintiffs contend that the trial court erred in finding that the City of Rayne did not have actual or constructive notice of the condition of the sidewalk at the time of the fall and did not fail to correct it within a reasonable time, as is necessary under La.R.S. 9:2800. We find merit in this assignment of error.

In its Pre-Trial Memorandum to the trial court, the City of Rayne admitted it "had actual notice of the sidewalk since this was one of the sidewalks which was in position to be repaired with the grant money in the year in question." Mark Daigle, the Director of Zoning, Planning, and Code Enforcement for the City, testified that he was aware that the City of Rayne received a grant for sidewalk repair in 2013.[1] He explained that then-mayor Roland Boudreaux "asked [him] to kind of help compile a list of -- and map out where were [sic] the problem areas and the worst areas and then try to prioritize sidewalks that needed attention and attempt to divide them equally between the four districts in town." Mr. Daigle included the sidewalk near Rayne High School in this list and indicated at trial that he noticed its condition from the street. He further alleged that he took three photographs of "three different situations" in the area sometime between July and September 2013, months before Cora Minix fell. Each photograph shows a section of the sidewalk adjacent to Polk St. where concrete sections are missing or the concrete has significant cracks or both. These photographs were introduced at trial as Rayne Number 2-A, 2-B, and 2-C. Mr. Daigle described Rayne 2-A at trial by saying that it appeared as though the concrete was still there, but that "it looks like

---

[1] Mr. Daigle explained that many of the City's sidewalks were "destroyed" in 2003 after trucks and heavy equipment were used to remove fallen trees after Hurricane Lili.

it sank." He suspected that this condition was caused by someone who broke the concrete to run a sewer line from the water meter to the school. He described another portion of the sidewalk as having "about a four foot section" of concrete missing.

Cora Minix identified the sidewalk pictured in Rayne 2-A as the portion of the sidewalk where she fell. She identified the spot on the photograph where her foot landed before the concrete shifted and caused her ankle to roll.

We find the City had actual notice of the defective sidewalk at the time Cora Minix fell and the trial court's finding to the contrary is clearly unsupported by the record.

*Unreasonable Risk of Harm – Open and Obvious*

In its second assignment of error, the plaintiffs argue that the trial court erred in finding that the alleged defective nature of the sidewalk was open and obvious, such that it did not present an unreasonable risk of harm. They assert that "the photographs produced at trial show that the defective portion of the sidewalk was covered with grass, weeds and vegetation and was hiding or obscuring from view the defective condition, such that it is not open and obvious and did create an unreasonable risk of harm[.]" Moreover, the plaintiffs argue that "no one from the city could even describe the defect[,]" and that "[i]f the defect was so open and obvious, as the [t]rial [c]ourt stated, then the Mayor and city employees who went to the site, both before and after this accident, should have been able to describe it."

Debra Gothe, a Rayne High School custodian who witnessed Cora's fall, indicated at trial that she was aware of two missing sections of concrete on the sidewalk, agreeing that they had been missing "for a period of time" before the

accident. City of Rayne Street Commissioner Robert Senegal related that he observed the condition of the sidewalk at one point as he drove by it on the street, but he could not recall when this happened. He also related that, while there was concrete in the portion of sidewalk near the water meter, "there was a piece missing, like a little circle." He further stated that in this area, the concrete was "leaning down" where it was "broken[.]" He indicated that there were "no jagged edges or big pieces sticking up" and that the concrete was "flat[.]"

Even Cora testified under cross examination that she did not notice the missing sections of concrete clearly depicted in the photographs: one where she fell next to a water meter and another that she had to traverse on her way to school before she fell.

In its written reasons for judgment, the trial court stated:

> In the instant case, the accident occurred on a clear, sunny day. The plaintiff testified that she was not distracted and was looking straight ahead at the time of the accident. The evidence and testimony of the plaintiff showed that prior to her falling on the section of sidewalk in question, she had to traverse another section of the sidewalk within feet of where she fell which contained irregularities. She did so without incident. . . . The evidence and testimony of witnesses called by the plaintiff showed that the missing piece of sidewalk was open and obvious. There were no shrubs or trees in close proximity to the sidewalk and there was a coloring differential between the sidewalk and the grass covered portion, alerting pedestrians to a deviation in the sidewalk. This court was given no measurements on the deviation or even whether there was concrete beneath the grass.

In this case, though, the issue is not whether the missing pieces of concrete were open and apparent. The critical issue is whether the concrete piece that shifted when Cora fell was open and obvious. Mr. Senegal testified that he did not know whether there were any loose pieces in the sidewalk when he was sent to tear the sidewalk up in preparation for laying a new sidewalk in that area. Cora

testified that she was not distracted when she fell. She said, "As I stepped on the concrete, I felt like the concrete shifted and I lost my balance and I fell." There was no evidence that contradicted Cora's statement. Cora could not have seen that the concrete would shift until she stepped on it. We find that a defect in the sidewalk that does not manifest itself until the pedestrian actually steps on the defective spot cannot be held to be open, obvious, or apparent.

In addition to the trial court's conclusion that the condition of the sidewalk was open and obvious, the plaintiffs assert that the trial court erred in balancing the remaining risk-utility factors. In particular, the plaintiff focuses on the third factor, the cost of preventing harm. In this regard, the trial court found the City lacked finances in relation to its high number of sidewalks in need of repair. In its written reasons for judgment, the trial court stated the following:

> In addition, the representative from the city of Rayne testified that the condition of many of the sidewalks in the city were in need of repair from a storm in the past. The City was in the process of repairing the sidewalks with grant money they had received. However, the City was unable to repair all the sidewalks at the same time because the sheer cost of replacing all the damaged sidewalks was beyond the City's budget capabilities.

The supreme court has stated that, "[a]s part of the cost analysis, the physical and financial inability of a municipality to maintain its things in anything more than a reasonably safe condition has been considered by this Court as a factor in determining whether such condition creates an unreasonable risk of harm." *Chambers*, 85 So.3d at 600. Significantly, courts should consider "not only the cost to fix the instant deviation, but also all similar deviations." *Id*.

In this case, Mayor Boudreaux testified that the city had received a grant to repair sidewalks and had set aside general funds of the city in addition to the grant money for sidewalk repairs. The agreement with the Louisiana Division of

Administration, which constituted acceptance of the funds, was signed by Mayor Boudreaux on August 1, 2013. The sidewalk area on Polk St. where Cora fell was on the City's list of sidewalks to repair. The sidewalk repairs began in August, three months before this accident, according to Mayor Boudreaux. The City was able to replace the sidewalk where the accident occurred within days of the accident, according to Mayor Boudreaux and City employees Mr. Daigle and Mr. Senegal. We find the City had the ample funding and ample time to repair this sidewalk. The trial court was manifestly erroneous in its finding to the contrary.

*Dismissal of Claims and Failure to Award Damages*

We find the City of Rayne had custody and control of the sidewalk at issue in this case. We find the City knew of the defective condition of the sidewalk months before Cora's fall. We find defect in the sidewalk which caused Cora's fall was unreasonably dangerous, that it was not open and obvious, and that the City had the funds and opportunity to repair the sidewalk.

We also find that the defect in the sidewalk was the sole cause of Cora's injuries. There was no evidence to contradict Cora's testimony that the shifting sidewalk caused her ankle to roll and her to fall. Therefore, we assess 100% of the liability for the injuries sustained by Cora to the City of Rayne.

Since the trial court failed to reach the issue of damages because it found the city was not liable, we must determine the amount of damages to compensate for Cora's injuries. When a trial court fails to reach an issue because of an earlier finding which disposes of the case, the court of appeal, in reversing the earlier finding, shall make a de novo determination of the undecided issues from the facts in the record. *LeBlanc v. Stevenson*, 00–157 (La. 10/17/00), 770 So.2d 766.

Cora reported to the hospital on the day of the accident with pain to her right knee, right ankle, and right hip. She testified that after the accident, she did not go to school for two months. She was homeschooled because she could not climb stairs. She testified that she could not perform chores around the house during that time because of her limited mobility. She received treatment from her pediatrician for two months specifically for the knee pain and complained about the knee pain in November 2014 and March 2015. We note that Cora had previously had surgery for scoliosis. She followed up with the orthopedic surgeon who performed her previous back surgery. In November 2014, Cora complained to a chiropractor, Dr. David Barczyk, about pain in her lower back.

Mr. and Mrs. Minix introduced evidence of $6,284.07 in medical expenses related to Cora's treatment after the accident. After discounting the amount by $4,178.46, Medicaid paid $1,353.61. The balance of unpaid medical bills is $752.00. Thus, Cora's compensable medical bills are $2,105.61. Pursuant to *Bozeman v. State*, 03-1016 (La. 7/2/04), 879 So.2d 692, we award judgment to Mr. and Mrs. Minix, on behalf of Cora, against the City of Rayne in the amount of $2,105.61 for medical expenses. Further, we award general damages in the amount of $20,000.00 to compensate Cora for her pain and suffering and loss of enjoyment of life. Costs of this appeal are assessed to the City of Rayne.

**REVERSED AND RENDERED.**

11

AMY, J., dissenting.

In my opinion, the standard of appellate review dictates an affirmation in this matter. Chiefly, I find no manifest error in the trial court's determination that the sidewalk did not present an unreasonable risk of harm. That conclusion is supported by the record and, in my view, is determinative in this case.

The majority opinion provides the pertinent legal framework, recognizing that jurisprudence interpreting La.R.S. 9:2800 indicates that a plaintiff seeking to hold a public entity liable for damages caused by a thing must prove: "(1) custody or ownership of the defective thing by the public entity; (2) the defect created an unreasonable risk of harm; (3) the public entity had actual or constructive notice of the defect; (4) the public entity failed to take corrective action within a reasonable time; and (5) causation." *Chambers v. Village of Moreauville,* 11-898, p. 5 (La. 1/24/12), 85 So.3d 593, 597 (citations omitted).

In assessing the unreasonable risk of harm element, the supreme court has further instructed that courts must consider: "(1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility, or whether it is dangerous by nature." *Dauzat v. Curnest Guillot Logging Inc.*, 08-0528, p. 5 (La. 12/2/08), 995 So.2d 1184, 1186-87 (citations omitted). *See also Pryor v. Iberia Parish Sch. Bd.*, 10-1683 (La. 3/15/11), 60 So.3d 594. I differ from the majority in the application of that framework to the ruling now under review.

In written reasons for judgment, the trial court stated:

> In the instant case, the accident occurred on a clear, sunny day. The plaintiff testified that she was not distracted and was looking straight ahead at the time of the accident. The evidence and testimony of the plaintiff showed that prior to her falling on the section of sidewalk in question, she had to traverse another section of the sidewalk within feet of where she fell which contained irregularities. She did so without incident. . . . The evidence and testimony of witnesses called by the

plaintiff showed that the missing piece of sidewalk was open and obvious. There were no shrubs or trees in close proximity to the sidewalk and there was a coloring differential between the sidewalk and the grass covered portion, alerting pedestrians to a deviation in the sidewalk. This court was given no measurements on the deviation or even whether there was concrete beneath the grass.

. . . .

Furthermore, another factor relevant to the risk of harm in a sidewalk case is the number of years the defect existed relative to pedestrian traffic and the number of incidents reported. In this case, the sidewalk in question was in front of a high school, in a high traffic area and, plaintiff was the only reported person to have fallen on this piece of sidewalk. Additionally, the plaintiff testified that she did not notice the first piece of missing concrete, nor did she notice the second piece of missing concrete. According to her testimony, she was not distracted at the time of the accident.

Thus, the plaintiff would need to show that, even though open and obvious, the defective sidewalk was so unreasonably dangerous that she could not be expected to traverse it safely. The plaintiff testified that when she stepped onto the missing sidewalk, it shifted causing her to fall to the ground. The witnesses, those from the school and from the city who inspected the sidewalk, could not testify as to whether there was any loose concrete, only that the sidewalk was possibly sunken and covered with grass. This court finds that it is a reasonable expectation for plaintiff, once aware of the condition of the sidewalk, to be on notice and exercise a higher standard of care in traversing the next section of missing sidewalk safely. Public entities only have a duty to keep sidewalks in a reasonably safe condition for pedestrians exercising reasonable care, keeping in mind that irregularities exist in sidewalks.

Given witness testimony in this case, I find that the trial court's ruling is in keeping with the supreme court's ruling in *Chambers*, 85 So.3d 593. As noted by the majority, the supreme court explained in that case that municipalities must maintain sidewalks in a reasonably safe condition, but that a pedestrian must exercise ordinary care in traversing the sidewalk, "keeping in mind that irregularities exist in sidewalks." *Id.* at 598. Further, and in a case involving a similar factual background to this matter, the first circuit affirmed a summary judgment in favor of the municipality where the plaintiff allegedly stepped in a "hole" on a sidewalk with "numerous areas where the concrete ha[d] shifted and fractured, resulting in cracks and crevices that extend[ed] the full depth of the sidewalk and, in some areas,

expose[d] the underlying ground." *Temple v. Morgan*, 15-1159, p. 3 (La.App. 1 Cir. 6/3/16), 196 So.3d 71, 72, *writ denied*, 16-1255 (La. 10/28/16), 208 So.3d 889. The first circuit determined that the sidewalk's defective condition was open and obvious and, thus, did not present an unreasonable risk of harm.

Like the plaintiff in *Temple*, 196 So.3d 71, Cora testified that she had no explanation for failing to notice the condition of the sidewalk aside from looking forward as she walked. While the plaintiffs suggest that grass obscured the view of the sidewalk, Cora's testimony undermined that assertion as she responded as follows to questions by her attorney:

Q      Did you notice that there was grass growing on the sidewalk?

A      There were pieces of grass in various places in the cracks.

. . . .

Q      Do you recognize what that picture is showing?

A      Yes, sir.  That is where I fell.

Q      Is that what it looked like on the day of the accident?

A      No, sir.  It had -- it seemed like the grass was in various places, but there wasn't much grass.

Further, on redirect examination and in reference to a photograph of the area, the following exchange occurred:

Q      Do you recall if that's what the -- the area of the sidewalk looked like on the day of your accident?

A      Yes, sir.

Q      Did it have that much grass on it the day of your accident?

A      No, sir.

That testimony concerning whether the sidewalk had less ground cover than evidenced in the photographs supports the trial court's ultimate finding that "[t]here were no shrubs or trees in close proximity to the sidewalk and there was a coloring differential between the sidewalk and the grass covered portion, alerting pedestrians to

14

a deviation in the sidewalk." Accordingly, after review I find no manifest error in the trial court's determination that the condition of the sidewalk was open and obvious. In fact, the sidewalk's generally poor condition was such that it was observed by several witnesses prior to the incident, including City employees and those who worked in the area. I further point out that, in addition to hearing witness testimony regarding the sidewalk, the trial court viewed photographs of the sidewalk and its surroundings.

Neither would I disturb the trial court's ultimate conclusion regarding an unreasonable risk of harm analysis given the trial court's consideration of the risk-utility factors. The plaintiff focuses on the third factor, the cost of preventing harm. On that point, the trial court recognized the City's apparent lack of finances in relation to its high number of sidewalks in need of repair, stating that:

> In addition, the representative from the [C]ity of Rayne testified that the condition of many of the sidewalks in the [C]ity were in need of repair from a storm in years past. The City was in the process of repairing the sidewalks with grant money they had received. However, the City was unable to repair all the sidewalks at the same time because the sheer cost of replacing all the damaged sidewalks was beyond the City's budget capabilities.

In this regard, Mark Daigle, the City's Director of Zoning, Planning, and Code Enforcement testified regarding a 2013 grant received for sidewalk repair. However, he stated that the list of sidewalks in need of repair consisted of "close to 100" locations in the City and that, while the City requested a grant of $50,000.00, it was ultimately given $22,865.00 in August 2013. Mayor Roland Boudreaux explained that the award was not enough "to make a major difference." The City also set aside a portion of its general fund toward sidewalk repair that year, but the City still lacked adequate funding to repair each defective sidewalk, as Mayor Boudreaux estimated that it could have cost "in the hundreds of thousands, possibly a million dollars." When questioned whether "the [C]ity [had] the funds…to fix all the sidewalks in any particular year[,]" Mayor Boudreaux responded: "Absolutely not."

15

For this reason, according to Mayor Boudreaux, the City established a priority list for repairing the sidewalks, first addressing areas used by the elderly and the disabled, then turning to commercial areas and churches. The City maintained that it was in the process of prioritizing the sidewalks to be repaired when the accident occurred, approximately three months after the August 2013 grant. Mayor Boudreaux testified that he visited the sidewalk shortly after the accident and noted "an elevation difference" near the water meter but he could not recall whether any concrete was missing or loose. He confirmed that there "were definitely deficiencies," but further explained that "they weren't the worst ones."

The trial court's evaluation of such testimony must not be discounted, as the supreme court has stated that, "[a]s part of the cost analysis, the physical and financial inability of a municipality to maintain its things in anything more than a reasonably safe condition has been considered by this Court as a factor in determining whether such condition creates an unreasonable risk of harm." *Chambers*, 85 So.3d at 600. Significantly, courts should consider "not only the cost to fix the instant deviation, but also all similar deviations." *Id*. My appreciation of the trial court's ruling indicates that it complied with that directive and that, in turn, the record supports its determination as to that factor.

While my conclusion that the trial court did not manifestly err in finding that the plaintiffs failed to demonstrate an unreasonable risk of harm pretermits review of the merits of the remaining assignments, I make one final observation regarding the plaintiffs' argument before the court. The plaintiffs suggest in their first assignment that the trial court erred in failing to determine that the City had actual or constructive notice of the "defect[.]" The plaintiffs do so by imputing notice to the City given its memorandum statement that it "had actual notice of the sidewalk since this was one of the sidewalks which was in position to be repaired with the grant money in the year in question." However, in the analysis of the unreasonable risk of harm element and the

16

issue of whether the condition was open and obvious, the plaintiffs further particularize the "defect" as "the uneven, sunken and loose concrete hidden under the grass covering the sidewalk." In my opinion, such a narrowing of the identity of the "defect" from the overall poor condition, as pertinent to the notice element, to the identity of the particularized "defect" in the unreasonable risk of harm element, results in an inconsistency in application of the elements of La.R.S. 9:2800. Given my above-stated determination regarding the latter element, I do not further discuss the issue of actual or constructive notice.

For these reasons, I respectfully dissent.